FILED & JUDGMENT ENTERED
Steven T. Salata

Apr 18 2014

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | **Chapter 11** |
| CAROLINA INTERNET, LTD.    ) | Case No. 11-32461 |
| ) | |
| Debtor.    ) | |

**ORDER GRANTING INJUNCTION BUT
DENYING MOTION FOR SANCTIONS**

THIS MATTER came before this Court on Debtor Carolina Internet's ("Carolina Internet") Motion for Sanctions against Brad O'Dell ("O'Dell"), filed December 12, 2013. Hearings were held on January 14, 2014, February 6, 2014, February 19, 2014, and March 6, 2014. Chris Chagaris and Richard M. Mitchell appeared on behalf of Carolina Internet and Kenneth T. Lautenschlager appeared on behalf of O'Dell.

As stated on the record in the hearing on March 6, 2014, the Motion is **GRANTED in part and DENIED in part**. O'Dell is enjoined from prosecuting the state court action against Carolina Internet; however, the Court declines the request for sanctions.

1

## FACTS AND PROCEDURAL HISTORY

On September 23, 2011, Carolina Internet filed a voluntary Chapter 11 case in this judicial district. At the time of filing, the Debtor had an oral understanding with O'Dell, whereby Carolina Internet was paying him (monthly) 6.5% of its sales made to an entity known as Data Conversions. Data Conversions is Carolina Internet's primary customer, accounting for 60% of its revenues. O'Dell was a founder of Data Conversions and had been instrumental in securing the Data Conversions account for Carolina Internet, and was believed by the Debtor to still possess the ability to take that account away. Carolina Internet typically paid O'Dell between $25,000 and $45,000 per month.

This was a relationship that the two sides did not advertise. Carolina Internet failed to list O'Dell in the Petition or matrix filed on September 23, 2011. He was not mentioned in its Schedules and Statements filed on October 6, 2011. Although his payments were funded out of the Debtor's cash flow, he was not mentioned in its cash collateral motion, or at the hearings, or in the proposed operating budget.

Significantly, O'Dell is not mentioned in Schedule G where a debtor is required to list its executory contracts. Consequently, O'Dell did not receive formal notice of the bankruptcy filing or of the case hearings.

Nevertheless, O'Dell was fully aware of Carolina Internet's Chapter 11 filing. In the period leading up to bankruptcy, O'Dell had weekly conversations with Matt White ("White"), the president of the Debtor, in which the TW Telecom default judgment and execution, and a possible bankruptcy filing by Carolina Internet, were discussed. Similar weekly meetings were held throughout the pendency of the case. Specifically,

O'Dell was present in meetings with Carolina Internet and Data Conversions the day before, and the day after, the bankruptcy filing date.

While Carolina Internet failed to list O'Dell among its executory contracts, it treated his payment arrangement as if it were such. Unlike other unsecured debts (which could not be paid pending plan confirmation), during the first months of the Chapter 11 case, Carolina Internet continued its monthly payments to O'Dell.

In the budget belatedly submitted in conjunction with the cash collateral hearing, Carolina Internet included a $22,124.66 October expense described as "Sales Commissions." When the Creditor's Committee ("Committee") investigated, it learned that this was a payment made to O'Dell, that he was not employed by the Debtor, and that he did not even have a written contract with Carolina Internet. Not surprisingly, the Committee viewed the arrangement as basically a "kickback." By letter of December 6, 2011, the Committee demanded that these payments cease and that Carolina Internet take steps to recover the payments made to O'Dell after bankruptcy which, by now included distributions for November and December.

Fearing that if not paid, O'Dell might take away the Data Conversions account,[1] Carolina Internet moved to assume his alleged (executory) contract on December 14did, 2011. [ECF No. 134] This was only the third month of the case, and well before the bar date for creditors, such as O'Dell, to file claims in the case.

Repeating its earlier performance, Carolina Internet did not serve O'Dell with this motion. Again, however, O'Dell was entirely aware of the motion. In fact, he

---

[1] In another case dispute, TW Telecom solicited the Data Conversions account for itself, leading Carolina Internet to seek sanctions. See Debtor's Motion for Sanctions, October 19, 2011 [ECF No. 47]. That solicitation was directed at O'Dell.

3

helped prepare it. On December 12, 2011, and at Carolina Internet's request, O'Dell prepared the attachment to the motion which details his alleged services to the Debtor for which he was to be compensated. The Committee objected to the motion to assume on February 3, 2012. [ECF No. 186] A hearing on the motion was calendared, but continued at the parties' request, to permit investigation.

Meanwhile, O'Dell was subpoenaed by TW Telecom to testify in regard to another matter in the bankruptcy case. [ECF No. 141] His subpoena bears the bankruptcy case caption, including the case number. It names Carolina Internet as the debtor, contains pertinent court information, and demands that O'Dell appear and testify on two separate occasions: first at a deposition, and then at a court hearing. *Id.*

In response to this subpoena, O'Dell, on February 14, 2011, hired attorney Joe Ledford ("Ledford") to represent him. Ledford spoke to both Debtor's counsel and Committee counsel on several occasions on O'Dell's behalf. These conversations related not just to the subpoena, but to O'Dell's monthly payments, which had stopped after the Committee raised an objection.

Ledford never entered a formal appearance in this bankruptcy case on behalf of O'Dell, an act that appears intentional. However, with the Debtor championing his payment demands through the assumption motion, and Data Conversions seeking to have his subpoena quashed as well as its own, there was little need for him to do so.

The O'Dell payment arrangement remained highly controversial. Not only did the Committee object to paying O'Dell going forward, the Committee threatened to sue O'Dell to recover the sums previously paid him. After several continuances of the assumption motion, and with it increasingly clear that it was unlikely to succeed,

4

Carolina Internet abandoned the Motion to Assume.

The regular conversations between O'Dell and the Debtor's officers during bankruptcy have been noted. After the monthly payments to O'Dell became an issue in the case and his payments ceased, this too became a regular topic of these discussions. In emails, telephone conversations, and face-to-face meetings between the parties, the payment situation was discussed. O'Dell, of course, wanted the payments to resume. White told O'Dell of the creditor opposition that prevented Carolina Internet from resuming the payments and of the threats to sue O'Dell. They discussed the Motion to Assume and eventually, White told O'Dell that they didn't believe the Motion could succeed. The Debtor's proposed plan of reorganization was also discussed.

Similar conversations were had between Ledford and Mitchell and Ledford and Committee Counsel. At one point, after being informed that due to creditor opposition Carolina Internet could not get the Assumption Motion approved, Ledford asked Mitchell what else he could do to O'Dell paid. Mitchell suggested that O'Dell file a proof of claim, but pointed out that if he did, he would be submitting to bankruptcy court jurisdiction. O'Dell never filed a claim, and he never filed a motion of his own to compel payment.

Carolina Internet filed its first Plan of Reorganization and Disclosure Statement on April 23, 2012. [ECF Nos. 257, 258] In attempt to win Committee support, it proposed to withdraw the Motion to Assume and reject the contract. Once again, O'Dell was not served with the Plan and the Disclosure Statement, but he was made aware that the Plan did not provide for the assumption of his contract through his weekly conversations with White. That initial Plan was opposed by creditors and never

5

submitted for voting.

Instead, over the next nine months, Carolina Internet and its creditors negotiated the terms and conditions of a consensual plan. That plan, Carolina Internet's Third Amended Plan, was confirmed without Opposition on December 12, 2012. [ECF No. 585]. During this nine month period, and although represented by counsel, O'Dell never asked this court for relief, never filed a proof of claim, and never injected himself into these proceedings.

O'Dell's passivity about losing $22,000 per month makes no rational sense. However, it is explained by a conversation between O'Dell and White that occurred back in April 2012 after Carolina Internet filed its initial draft Plan. For the first time, Carolina Internet indicated that it was abandoning the assumption motion and instead would reject the O'Dell arrangement.

While Carolina Internet was telling creditors it would no longer pay O'Dell the disputed payments, it was telling O'Dell the opposite. In a conversation with O'Dell, White advised that it was unlikely that these payments could continue while Carolina Internet was in bankruptcy. However, White promised that these payments could resume once the company was out of bankruptcy. It would be "business as usual." O'Dell was mollified, sat out the confirmation process, and waited for the case to be closed.

The Plan that was ultimately negotiated by Carolina Internet and its primary creditors was dependent on a loan. Scott Coffman ("Coffman"), the principal of Data Conversions, agreed to lend $3.2 million dollars to the principals of Carolina Internet. They in turn agreed to use the loan proceeds to purchase the equity in the reorganized

6

debtor. The loan proceeds were used to fund the plan and to pay unsecured creditors.

As a condition of the loan agreement, Carolina Internet agreed that it would "not incur, create, assume or permit to exist any Indebtedness…except for indebtedness provided or allowed under the Plan of Reorganization…." [ECF No. 546] O'Dell's claim was not provided for or allowed under the Plan.

Further, the confirmed Plan provided that, "Unless otherwise specified by an order of the Bankruptcy Court, any Proofs of Claims based on the rejection of the Debtor's Executor Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with the Court no later than 30 days after the effective date of such rejection…." [ECF No. 524] O'Dell failed to file a claim or otherwise request payments.

These provisions were important to Coffman/Data Conversions for two obvious reasons. First, Data Conversion's business operations were dependent on those of its bandwidth provider, Carolina Internet. Coffman/Data Conversions were vitally interested in seeing that Carolina Internet receive a "fresh start" free of existing debt obligations. Hence, Coffman was willing to make a loan to take out prepetition creditors.

Second and similarly, Coffman was now owed a considerable loan debt by the Debtor's owners. Their ability to repay the debt was dependent on the Debtor's continued profitability.

The Plan was confirmed on December 12, 2012. It rejected all executory contracts not expressly assumed, including O'Dell's payment arrangement. The Plan was consummated and Carolina Internet's debts were discharged pursuant to 11 U.S.C. §1141(d)(l)(A). The bankruptcy case was closed on March 11, 2013.

Apparently, Carolina Internet did not make good on its 'under the table'

agreement with O'Dell. On October 22, 2013, O'Dell filed a Complaint in the General Court of Justice for Mecklenburg County, North Carolina Superior Court Division seeking commissions allegedly owed to him by the Debtor under the payment arrangement for time periods that fell during and after Carolina Internet's bankruptcy.

On November 4, 2013, the Court granted Carolina Internet's Motion to Reopen the bankruptcy case for the purpose of filing the present motion.

## DISCUSSION

### A. Statutory Bankruptcy Principles

Generally, a confirmed plan is binding on every entity that has a claim against the debtor, even if the claim is not scheduled, even if the entity does not file a claim, and even if the plan does not provide for a distribution. Under 11 U.S.C §1141(d)(1), confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation, regardless of whether a proof of claim based on such debt was filed, the claim was allowed under §502, or the holder of the claim accepted the plan.

A confirmed plan has a res judicata effect that precludes parties from raising claims that could have been or should have been raised before confirmation, but were not. *See In re Varet Enterprises, Inc.,* 81 F.3d 1310, 1315 (4th Cir. 1996) ("A bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect.") In this sense, the plan is binding on the world, to the extent it touches the Debtor, its rights, assets, or obligations as of the confirmation date. *See* Collier on Bankruptcy §[1141-8] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Upon confirmation, the plan terms become a substitute for the pre-petition debt and all rights of holders of claims and interests, except as provided by the plan, are terminated. *Id.* Effectively, a

confirmation plan is binding on all parties and interests, whether or not they have chosen to appear in the case.

The payments owed by Carolina Internet to O'Dell, if any, could constitute a gratuity, a contractual right to payment, and if the latter, potentially an executory contract. Any such liability owed to O'Dell would constitute a prepetition debt under the conduct rule. *See In re Stewart Foods, Inc.,* 64 F.3d 141 (4th Cir. 1995) (Payments to retirees which became due after employer's Chapter 11 filing under a prepetition "retirement agreement" were "prepetition obligations.); *Collier on Bankruptcy*, §[1141.05[1](a)] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (explaining that a claim arises at the time of the debtor's conduct giving rise to the alleged liability, rather than when the cause of action accrued); 11 U.S.C. §365(g)(1) (Rejection of an executory contract constitutes a breach of the contract immediately before the date of filing of the bankruptcy petition); 11 U.S.C. §502(g) (Any claim for damages arising from rejection of an executory contract is treated as if it arose before the date of filing of the bankruptcy petition.). Thus, any liabilities arising from that alleged agreement, to the extent not addressed or provided for under the plan, would be discharged upon confirmation.

The fact that Carolina Internet and O'Dell had a side deal to pay O'Dell after bankruptcy does not alter this result. In the Chapter 11 context, if a debtor would like to waive its discharge as to a particular creditor, it must go through the process established in 11 U.S.C. §1141(d)(4). Under §1141(d)(4), a discharge waiver must be in writing and approved by the court. *See In re Lucchesi,* 181 B.R. 922, 929 (Bankr. W.D. Tenn. 1995) (An oral promise to pay does not meet the statutory requirements for a waiver of discharge under §1141(d)(4)). Obviously, both requirements are unmet in

9

this case.

Thus under §1141(d), it would appear that Carolina Internet's confirmed plan discharged O'Dell's claims even though he did not file a proof of claim or accept the plan.

### B. Constitutional Principles

One caveat applies to the foregoing. Although §1141 appears to permit a claim to be extinguished notwithstanding the fact that the holder has not received notice, this raises a potential constitutional issue under the Due Process Clause of the Fifth Amendment. The Fifth Amendment provides that "no person shall…be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V.

The seminal Supreme Court case on due process rights and notice requirements is *Mullane v. Central Hanover Bank.* 339 U.S. 306 (1950). There, the Supreme Court explained:

> [A]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information.

*Id.* at 351.

The *Mullane* holding was amplified three years later by *New York v. New York, N.H. & H.R. Co.,* a railroad reorganization case under the old Bankruptcy Act, in which the Supreme Court held that even creditors with knowledge of a reorganization have a right to assume that statutory 'reasonable notice' will be given to them before their claims are forever barred. 344 U.S. 293, 297 (1953).

More recently, the Supreme Court has noted that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting its earlier holding in *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, (1961)). Further, "due process is flexible and calls for such procedural protection as the particular situation demands." *Morrissey v. Brewer,* 408 U.A. 471, 481 (1972).

Just what form of notice is constitutionally required in a bankruptcy case is difficult to pin down. Whether constructive notice is sufficient or whether formal, written notice is required depends on whether the creditor is known to the debtor. *Tessler,* 492 F.3d at 249. In some circumstances, actual notice is sufficient to satisfy due process concerns. Bankruptcy jurisprudence is replete with cases holding that "notice is adequate when it is shown that although a party did not receive formal notice, actual notice was received." *In re Fusco*, 2008 WL 4298584, at *6 (B.A.P. 6th Cir. 2008). There are also cases holding that due process is not offended by requiring a person with actual, timely knowledge of an event that may affect a right to exercise due diligence and take necessary steps to preserve that right. *See In re Medaglia*, 52 F.3d 451, 455 (2d. Cir. 1995) (finding creditor's actual knowledge of bankruptcy petition was constitutionally sufficient notice of deadline for filing objections to discharge).[2]

---

[2] This is also the case in the §362 stay violation context. *See In re Brannon,* No. 12-00114, 2013 WL 237759 (Bankr. S.D. A.L. Jan. 22, 2013) (stating that actual notice of the bankruptcy filing, although not formal notice, is sufficient for §362 purposes); *In re Weatherford,* 413 B.R. 273 (Bankr. D. S.C. 2009) (holding that a creditor with actual notice of the bankruptcy, not formal notice, committed a willful violation of the stay); *In re Kanipe,* 293 B.R. 750, 755 (Bankr. E.D. Tenn 2002) (holding that if a creditor had actual knowledge of the bankruptcy filing despite the incorrect address on the petition, then notice would be sufficient to support a stay violation).

However, case law tends towards requiring formal, written notice for plans. *See Christopher v Kendavis Holding Co. (In re Kendavis Holding Co.)* 249 F.3d 383 (5th Cir. 2011) (former employee's pension plan termination was not discharged even though he had actual knowledge of the case because he did not receive formal notice of the case); *In re Unioil, Inc.* 948 F.2d 678 (10th Cir. 1991) (failure to give a known creditor formal notice of the deadline for filing claims and objections to confirmation and of the date of confirmation prevented the claims from being discharged); *In re Spring Valley Farms, Inc.* 863 F.2d 832 (11th Cir. 1998) (discharge doesn't bar claim of creditor who did not receive notice of claims bar date even if creditor knew of the pendency of the Chapter 11 case); *cf In re Coastal Alaska Lines, Inc.,* 920 F.2d 1428, 1431 (9th Cir. 1990) (holding that a creditor with more than mere knowledge of the bankruptcy is bound by the court imposed claims filing bar date, regardless of the fact that notice had not been sent pursuant to the Bankruptcy Code and Rules); *In re Fairchild Aircraft Corp.,* 128 B.R. 976, 985 (Bankr. W.D. Tex. 1991) (holding that a plaintiff who had actual notice of the bankruptcy case and bar claims date was barred by the plan despite no formal notice); *In re Intaco Puerto Rico, Inc.,* 494 F.2d 94, 99 n. 11 (1st Cir.1974) (holding that claims can be forever barred despite the debtor's failure to give the requisite statutory notice if the creditor possessed actual notice of particular developments within the bankruptcy proceeding adequate to permit the creditor to protect itself).

1. **Fourth Circuit Jurisprudence: *JA Jones v. Tessler*, and *Bosiger v. U.S. Airways.***

The Fourth Circuit has recently addressed the constitutional notice question in two Chapter 11 bankruptcy cases.

First, in *JA Jones, Inc. v. Tessler,* the Chapter 11 debtor had not scheduled a claim of the estate of a motorist who was killed in an accident in a construction zone. 492 F.3d 242 (4th Cir. 2007). The estate's administrator did not know of the bankruptcy, did not participate in plan confirmation, and did not learn of the bankruptcy until well after the bar date for filing pre-petition claims. The administrator sought leave to file a proof of claim after the bar date based on the debtor's failure to provide it with proper notice.

The Fourth Circuit affirmed the rulings of the bankruptcy court and district court and held that a "known creditor" of a bankruptcy estate is entitled to actual, as opposed to constructive, publication notice, of the debtor's bankruptcy filing and the applicable bar date. *Id.* at 249. Because the motorist's estate was a known creditor of the debtor and had not been scheduled, it was not barred by the Plan.

Six months later, the Fourth Circuit considered the notice question again in the case of *Bosiger v. U.S. Airways*. 510 F.3d 442 (4th Cir. 2007). This case, the second bankruptcy filing of the airline, involved a retired pilot who was a participant in the airline's pension plans. During the airline's first bankruptcy, the airline was forced to terminate those plans. *Id.* at 445. It is unclear whether the pilot received notice of the first bankruptcy, but he did receive notice of the second bankruptcy, in the form of two letters notifying him of the filing and bar date, and the order of confirmation and deadline for filing claims. *Id.* at 447. The pilot did not file a claim in the second bankruptcy case.

Rather, after it was over, he sued U.S. Airways in federal district court, arguing that the pension plan had been improperly terminated in the first bankruptcy and that he was not on proper notice of the second bankruptcy. *Id.*

The Fourth Circuit held that the pilot received adequate notice and was bound by the plan for four reasons. *Id.* First, under §1141(d), U.S. Airways' confirmed plan served to extinguish all pre-existing "Claims and Causes of Action, whether known or unknown." *Id.* Second, "allowing individual creditors to opt out of a formal bankruptcy proceeding in order to bring a subsequent civil lawsuit against a debtor only serves to make bankruptcy proceedings more complex and more costly," and "contradicts the Supreme Court's teaching that the prompt and efficient administration and settlement of a debtor's estate is a principal goal of bankruptcy law." *Id.* (*citing Katchen v. Landy,* 382 U.S. 323, 328 (1966)). Third, "unwinding the finality of bankruptcy upsets not only the expectations of the creditors who actually do participate in the bankruptcy proceedings, but also the reliance interests of the creditors who have advanced funds based on the new capital structure laid out in the reorganization plan." *Id.*

In its fourth reason, the Circuit rejected the pilot's contention that his Due Process rights had been violated. The *Bosiger* panel noted that the *Mullane* standard for constitutional notice has been interpreted flexibly, "measuring the adequacy of notice against the certainty of a creditor's claims." *Id.* That standard only requires "notice reasonably calculated, under all circumstances…" *Id.* Effectively, the notice must be sufficient to apprise a party of the bankruptcy and give it the opportunity to present objections.

The Circuit Court aptly noted that "the flexibility of the *Mullane* standard can make it difficult in certain cases to determine if a creditor received proper notice."

14

However, it did not do so in this case. The pilot received two letters, which were sufficient to establish that he received adequate notice. *Id.* Furthermore, the airline's bankruptcy was well publicized, and a retired pilot "could be expected to possess more than a passing interest in those proceedings." *Id.* at 452. The former statement points out the importance of formal written notice in the due process inquiry. However, the latter statement suggests that actual, informal notice is a factor as well.

### 2. Recent Supreme Court Jurisprudence: *United Student Aid Funds, Inc. v. Espinosa.*

The Supreme Court addressed due process notice in the bankruptcy plan context most recently in *United Student Aid Funds, Inc. v. Espinosa.* 599 U.S. 260 (2010). In that case, a Chapter 13 debtor proposed a plan which tried to discharge the interest on his student loans. The creditor got notice of the plan, did not object, and the plan was confirmed. Thereafter, the creditor argued that its due process rights were violated because student loans can only be discharged in an adversary proceeding. *See* Fed. Rs. Bankr. Proc. 7003, 7004, and 7008.

The Supreme Court disagreed. While the Debtor's failure to initiate an adversary proceeding violated a procedural rule, it was not a constitutional violation. The creditor had actual notice of the filing and of the plan which proposed to discharge the interest. *Espinosa,* 559 U.S. at 272. The Supreme Court reiterated the *Mullane* standard that notice only needs to be "reasonably calculated under all circumstances, to apprise interested parties of the pendency of an action and afford them the opportunity to present objection." *Id. (citing Mullane,* 339 U.S. at 314). It rejected the creditor's argument that it had no obligation to object to the debtor's plan until the

debtor served it with a summons and complaint and explained, "Rule 60(b)(4)[3] does not provide a license for litigants to sleep on their rights." *Id*. at 275. In other words, a creditor who had actual notice of a case cannot sit on its hands and later complain of a due process violation.[4]

### C. O'Dell Received Constitutional Due Process and is Bound by the Terms of the Plan.

There appear to be no published bankruptcy cases similar to the unique circumstances of this case. Here we have a putative creditor who did not receive formal notice of the bankruptcy filing or of the plan, but was active in the case behind the scenes and acting in consort with the debtor to subvert the bankruptcy process. While *Espinosa, Tessler, and Bosiger* lack these unique and unsavory aspects, taken together, they are instructive. They stand for the proposition that the *Mullane* standard is flexible, it only requires notice that is reasonably calculated under the circumstances, and the lack of procedurally adequate notice does not give a creditor an excuse to stick its head in the sand.

Under this flexible standard, O'Dell received constitutionally adequate notice under the circumstances. He was fully aware of intimate details of the bankruptcy as described above and then stood mute in hopes that his claim could survive the bankruptcy process. He was on the inside of the reorganization, not the outside.

---

[3] Rule 60(b) states, "On Motion and just terms, the court may relieve a party… from a final judgment, order, or proceeding for the following reasons: (4) the judgment is void."

[4] This ruling implicitly overruled *In re Linkous,* a Fourth Circuit case that the parties discussed at hearing. 990 F.2d 160 (4th Cir. 1993). In *In re Linkous,* the Fourth Circuit held that if any bankruptcy rule required a particular type of due process, in the form of an adversary proceeding, motion, etc., and something lesser had been afforded, then that creditor would not be bound by a Chapter 13 plan. *Id.* at 163.

The side deal O'Dell had with the Debtor was an attempt to accomplish by secret agreement they could not get done overtly in the bankruptcy case: pay a dubious claim in full, at the expense of other parties to the case.

Of course, O'Dell's ongoing payment arrangement was not provided for in plan; rather, it was rejected, and given that O'Dell chose not to file a claim in the case, it was not even an allowed prepetition unsecured debt.[5]

Perhaps allowing O'Dell to go forward would be fair to the Debtor since it proposed this 'end around' on the bankruptcy process. Debtors are required to list *all* creditors on their schedules and statements, under the penalty of perjury. O'Dell was a known creditor of Carolina Internet. Carolina Internet should have given him formal notice of the case and of case proceedings. It failed to do so, purposefully.

However, the prejudice to other case parties should O'Dell be allowed to forward is undeniable. To permit O'Dell to now recover from the Debtor for this disputed, unfiled, and unknown claim in state court would siphon off Carolina Internet's cash flow and/or its assets, and imperil its reorganization. It would bleed off roughly $25,000 of revenue each month. While the unsecured creditors are not dependent on Carolina's Internet's cash flow to be paid, Coffman, who made the $3.2 million dollar loan to fund the plan, is. His ability to be repaid by the Debtor's principals is in turn dependent on the success of its operations.

The Due Process Clause protects owners from deprivation of their property without an opportunity to present their objections *See Mullane,* 399 U.S. at 314; *see also Grannis v. Ordean,* 234 U.S. 385, 394 (1914) ("The fundamental requisite of due

---

[5] Section 365(g) gives a party whose executory contract has been rejected by the debtor, a prepetition claim for breach of contract.

process of law is the opportunity to be heard."). The clause was never intended to be a tool to a fraud. A favored creditor cannot willfully put his head in the sand, ignore what is going past him, all the while planning with his debtor to do something directly proscribed by law, and then object to the finality of the plan due to a lack of notice.

Frankly, given that both Carolina Internet and O'Dell are complicit, it is regrettable that one will prevail in the present matter. If the Debtor were the only party affected, it would be tempting to permit the action to go forward. However, this is not the case. The side deal is a fraud against Coffman, who funded the reorganization plan with a $3.2 million dollar loan, and is also a fraud on this court.

To allow O'Dell to seek collection of this "debt" would unwind the finality of the bankruptcy case and upset the expectations of parties like Coffman who openly participated in the bankruptcy proceedings.

In sum, O'Dell's tremendous knowledge of, and involvement in, this bankruptcy case satisfies constitutional due process concerns. His actual notice of the case means that the confirmed plan binds him under 11 U.S.C. §1141. While O'Dell was not formally served by the plan, he was more than aware that his claim was not provided for and he stood by and did nothing. Carolina Internet's confirmed plan did not provide for O'Dell's claim. His verbal contract, if that is what it is, was rejected. He is bound by the plan and will not be allowed to proceed in state court.

Accordingly, O'Dell is **ENJOINED** for proceeding in state court and attempting to collect this debt. He is directed to dismiss his action with prejudice within 21 days of entry of this order and to file a copy of that dismissal in this action within 28 days.

### D. The Debtor's Motion for Sanctions is DENIED.

Carolina Internet has asked for sanctions against O'Dell for bringing the state court action. Given the Debtor's actions and its complicity in subverting the reorganization process, the request is **DENIED.** The parties will bear their own costs.

**SO ORDERED**.

| | |
|---|---|
| This Order has been signed electronically. The Judge's signature and court's seal appear at the top of the Order. | United States Bankruptcy Court |